NOTICE
This order was filed under Supreme
Court Rule 23 and may not be cited
as precedent by any party except in
the limited circumstances allowed
under Rule 23(e)(1).

2020 IL App (4th) 190141-U

NO. 4-19-0141

IN THE APPELLATE COURT

OF ILLINOIS

FOURTH DISTRICT

FILED
December 31, 2020
Carla Bender
4th District Appellate
Court, IL

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| Plaintiff-Appellee, | ) | Circuit Court of |
| v. | ) | Adams County |
| JONATHAN P. DOVIN, | ) | No. 17CF950 |
| Defendant-Appellant. | ) | |
| | ) | Honorable |
| | ) | Scott D. Larson, |
| | ) | Judge Presiding. |

JUSTICE HARRIS delivered the judgment of the court.
Justices DeArmond and Holder White concurred in the judgment.

**ORDER**

¶ 1    *Held*:  The trial court did not err in finding that defendant was restored to fitness. The trial court did not err by not conducting a fitness hearing following defendant's statement in allocution.

¶ 2        In July 2018, the trial court found defendant, Jonathan P. Dovin, unfit to stand trial and ordered that he be placed in the custody of the Illinois Department of Human Services (Department) for treatment. In September 2018, the Department filed a report indicating defendant was fit to stand trial. The court subsequently conducted a fitness restoration hearing at which the only evidence presented by the parties was the Department's report. At the end of the proceeding, the court found defendant had been restored to fitness. After a bench trial, the court found defendant guilty of aggravated domestic battery (720 ILCS 5/12-3.2(a)(1) (West 2016)) and

intimidation (*id.* § 12-6(a)(1)) and sentenced him to five years' imprisonment. Defendant appeals, arguing the court erred when it found him restored to fitness and when it failed to *sua sponte* revisit the issue of his fitness during his sentencing hearing. We affirm.

¶ 3                                    I. BACKGROUND

¶ 4          On December 15, 2017, the State charged defendant with one count of aggravated domestic battery (720 ILCS 5/12-3.2(a)(1) (West 2016)) and one count of intimidation (*id.* § 12-6(a)(1)) arising out of an incident with his then-girlfriend. In January 2018, the trial court entered an order which indicated defense counsel had "raise[d] the suggestion of unfitness" and which directed Dr. Frank Froman to conduct a mental fitness evaluation. Dr. Froman's fitness report, which was filed in February 2018, noted defendant appeared to be "paranoid," "tend[ed] to look at life, society, and others with a great deal of suspicion, derision, and hostility," and exhibited "compulsive talking." Nonetheless, Dr. Froman concluded in his report that defendant understood "the charges against him" as well as "the nature of his rights, plea bargaining, and how to work with his attorney effectively" and was "able to stand trial." No additional judicial proceedings were conducted with respect to defendant's fitness based upon Dr. Froman's report.

¶ 5          During a status hearing on April 27, 2018, defense counsel informed the trial court he had "received some information" and, as a result "need[ed] to raise the issue of fitness again in this case." Defense counsel requested the court again appoint an expert to examine defendant's mental fitness. Although defendant interjected, "I will tell you, I'm not mentally incompetent," the court ultimately granted defense counsel's motion and, subsequently, appointed Dr. Terry Killian to examine defendant.

¶ 6          Dr. Killian interviewed defendant on June 22, 2018, and later filed a 10-page report containing his findings. Three pages of Dr. Killian's report consisted of statements made by

defendant which Dr. Killian noted were made "in great detail," "almost non-stop," and "without a lot of clarity." Examples of defendant's statements were that "[the victim] said in September 2017 that if he left, she would cut off his balls," "ISIS is written behind a church where [the victim] lived," "[the victim] was an informant, perhaps for the DEA," and "[the victim] [was] involved with JVL (Junior Vice Lord) in North Saint Louis." According to the report, defendant self-reported that he had multiple prior psychiatric disorder diagnoses and that in 2004 he had been found not guilty of committing a crime due to insanity. Dr. Killian opined defendant suffered from "probable schizophrenia," "probable major depressive disorder," "possible PTSD," and "polysubstance abuse disorder." Regarding defendant's fitness, the report indicated defendant understood the courtroom participants, courtroom procedure, plea bargaining process, current charges against him, and possible penalties. However, the report continued, "because of his very delusional ideas and his disjointed thinking, [defendant] would NOT be capable of disclosing to his attorney the available pertinent facts surrounding the offense or be capable of challenging the prosecution witnesses realistically." The report concluded defendant was "NOT fit to stand trial" because "he would not be able to rationally assist in his own defense when it comes to any discussion involving his mental health because of the severity of his delusional thinking and somewhat disjointed thought process." Dr. Killian opined defendant could "very likely be restored to fitness within a year."

¶ 7    On July 20, 2018, the trial court conducted a fitness hearing. At the beginning of the hearing, defense counsel informed the court the State did not object to a finding of unfitness based on Dr. Killian's report and the court entered an agreed order of unfitness. Defendant interrupted the proceedings and objected to Dr. Killian's evaluation, noting that he was not "informed that [he] did not have to cooperate with the evaluation, and [he] [did] it under objection"

and that Dr. Froman had previously found him fit to stand trial. Defendant complained he was "not being given [his] due process" and was "not having [his] constitutional rights respected." The court notified defendant of his appeal rights and ordered him placed in the custody of the Department.

¶ 8    On September 18, 2018, a representative from the Department sent the trial court a pretreatment fitness evaluation prepared by Valerie Bales, a licensed clinical social worker. In her report, Bales stated defendant's "judgment and impulse control ha[d] improved with the use of medication, however, by history he ha[d] poor judgment and poor impulse control." Bales's report referenced the diagnoses made in Dr. Froman's report but did not reference Dr. Killian's report at all. Bales opined, based on defendant's answers to her questions, defendant understood the charges against him, the purpose of a guilty plea and plea bargaining, the role of court personnel, and the trial process. Specifically, the report stated defendant "knows the charges [against him] are felonies and are serious charges that could result in a long prison sentence," "verbalized an accurate understanding of what it means if a person pleads [g]uilty or [n]ot [g]uilty," "was able to explain what a plea bargain is," "gave an adequate description of the [j]udge in a trial, as well as a [j]ury, witness[s], [p]rosecutor, and [p]ublic [d]efender," and "adequately explained what a trial is." The report also indicated defendant "gets along with" his defense counsel and would "be able to work with his attorney to assist in his own defense." Bales's report concluded:

> "Based upon the interview and his improved clinical status after he started taking medications at the jail, it is the opinion of [the Department] that [defendant] is aware of his current charges and has an adequate understanding of the nature and purpose of the proceedings against him. He is able to adequately cooperate with defense counsel as he demonstrated his ability to cooperate during this interview and voiced his intention and ability to do so in court. Therefore, it is the opinion of

- 4 -

[the Department] that [defendant] is FIT TO STAND TRIAL."

¶ 9         On September 28, 2018, the trial court conducted a fitness restoration hearing. During the proceeding, the State requested the court "consider the [Department's] report" and indicated it "would simply have argument on that report." Defense counsel stated he "ha[d] no evidence." The State then presented argument. During its argument, the State noted the report "[was] very thorough in going through all of the factors that they are to consider on the issue of fitness," referenced the bases of the report's fitness finding, and requested the court to "adopt the finding in the report." Defense counsel presented no argument. The court then issued its oral ruling:

> "All right. The [c]ourt has had the opportunity to review the report as well, does make reference to the specific sections that [the State] has pointed out.
>
> The [c]ourt does find that the evaluation—or the report was done also in a very thorough manner. And, essentially both parties are agreeing to the [c]ourt's considering that report from [the Department].
>
> It does indicate that the [d]efendant has knowledge and understanding of the charge, the proceedings, what a plea negotiation is, the function of a judge and jury.
>
> The report does indicate that [defendant] does—is oriented to time and place and that he can assist his attorney during the course of the trial in this case.
>
> So, based on all of the evidence, which essentially the parties are just providing nothing additional other than the report, but at least the parties having the opportunity to present further evidence, the [c]ourt can make the finding that [defendant] is fit to stand trial and that we can proceed with the case."

The court then scheduled defendant's case for trial.

¶ 10 In December 2018, defendant's cause proceeded to a bench trial during which defendant testified on his own behalf. At the end of the proceeding, the trial court found defendant guilty of both aggravated domestic battery and intimidation.

¶ 11 In January 2019, the trial court conducted defendant's sentencing hearing. After the parties presented evidence and argument, defendant made a long and, at times, non-sensical statement in allocution during which he raised multiple allegations of ineffective assistance of counsel. Once defendant concluded, the court continued the proceeding in order to conduct a hearing pursuant to *People v. Krankel*, 102 Ill. 2d 181, 464 N.E.2d 1045 (1984). During the *Krankel* hearing, defendant raised several allegations of ineffective assistance of counsel all of which the court ultimately rejected.

¶ 12 On March 1, 2019, the trial court concluded defendant's sentencing hearing. Before the court rendered its sentence, it offered defendant the opportunity to make another statement in allocution. Defendant began his statement by complaining defense counsel had asserted defendant was unfit at the April 27, 2018, hearing without consulting him first. Defendant then complained the court's finding of unfitness had been improperly entered. Specifically, defendant claimed he "was not told by [the court] or [his] attorney that [he] did not have to cooperate with [the] examination" and, "[i]f the [c]ourt *** [had] told [him he] did not have to cooperate with [Dr. Killian], *** [he] would have refused." Defendant also asserted the court's finding of unfitness had been improper for other reasons, including because "[a] finding of fitness [*sic*] may not be based on stipulation of psychiatric conclusions." Defendant noted:

"I, on the record, attempted to object to [Dr. Killian's] report being used by [defense counsel] as evidence and enter—entering into the court's record. I made mention of [Dr. Froman's] reports and spoke of the admonishment issue. This

objection was a valid and rational attempt to prevent undue delays and confusion of the issue like this case record shows."

In support of his claims, defendant cited the Code of Criminal Procedure of 1963 (Code) (725 ILCS 5/100-1 *et seq.* (West 2016), multiple appellate cases, an Illinois Supreme Court Rule, and the Illinois Rules of Evidence.

¶ 13          Halfway through defendant's statement, the trial court interrupted him and reminded him he had previously raised all of the allegations he was making and the court had previously addressed those allegations. The court instructed defendant to restrict the rest of his statement to "matters that apply toward this sentencing and the reason that we're here." Defendant then launched into a confusing and disorienting statement which he commenced by apologizing to the victim. Defendant then alleged the victim had threatened to "cut [his] balls off," the "State's Attorney and DCFS" were forcing the victim to "target" him "for the Salvation Army," and the victim treated him poorly due to her "personal issues and bisexual sexist outlook that was caused by her father and other men molesting and raping her." The following is a portion of defendant's statement:

"I am sorry I did it again like MFers do. Sorry MFers. I know I told you I wasn't going to. I had been involved with people who told me a captain with the Mexican drug cartel wanted me killed. I was shown a picture of this man while at Elba Carro in Kirksville. I had tried to talk to police, FBI, and DEA over this but have been disregarded as a crazy man between the inmates and government officials here in Adams County.

Aaron Lopez sent me a picture of $100,000, claimed he got busted. Then you showed me pictures of three federal agents, one a Spanish in a ski mask. I had

met a Mexican national here in Quincy at the Salvation Army homeless shelter in 2017. He told me that he knows the Lopezes and that it was time. I asked him what that meant, and then he stated, [y]ou fucked up. Then stated, [y]ou need to start talking to people about your problems. He told me not to tell anybody stating if anybody ever asked, you never met me. Then he went to St. Louis."

Defendant's statement concluded:

"I felt angel wings on my back like before my father passed away on July 20th, 2015. I have—kept having a strange sense of déjà vu and reoccurring dreams between both people. I also reported I believed my—my grandmother has passed and my cousin. I expressed reoccurring dreams of children being hurt and me drowning.

You may think all of this does not matter, but I do. I have psychiatric— psychic experiences over and over in my life and have experienced this clairvoyant premonition enough to follow it instinctively. Personal believes and values and spiritualism."

The record of proceedings reflects, after defendant ended his statement, he started speaking a "[l]anguage other than English." After defendant concluded, the court sentenced him to five years' imprisonment.

¶ 14       This appeal followed.

¶ 15                                II. ANALYSIS

¶ 16       On appeal, defendant argues the trial court erred when it found him restored to fitness and when it failed to *sua sponte* revisit the issue of his fitness during the resumed sentencing hearing. Defendant acknowledges these issues were not preserved for appellate review. See *People*

*v. Enoch*, 122 Ill. 2d 176, 186, 522 N.E.2d 1124, 1130 (1988) (finding that, to preserve an issue for appellate review, both an objection at trial and a written post-trial motion raising the issue are required). However, defendant asserts, and we agree, that the issues may be reviewed for plain error. See *People v. Sandham*, 174 Ill. 2d 379, 382, 673 N.E.2d 1032, 1033 (1996); see also *People v. Shaw*, 2015 IL App (4th) 140106, ¶ 23, 44 N.E.3d 665.

¶ 17        "Due process bars prosecuting or sentencing a defendant who is not competent to stand trial." *Sandham*, 174 Ill. 2d at 382. The Code provides, "[a] defendant is presumed to be fit to stand trial or to plead, and be sentenced." 725 ILCS 5/104-10 (West 2016). A defendant will only be found unfit if, "because of his mental or physical condition, he is unable to understand the nature and purpose of the proceedings against him or to assist in his defense." *Id.* Anytime "a *bona fide* doubt" of the defendant's mental fitness is raised, the trial court is required to "order an examination of the defendant by one or more licensed physicians, clinical psychologists, or psychiatrists chosen by the court." *Id.* §§ 104-11, 104-13. Section 104-16 of the Code requires the court to conduct a hearing within 45 days of receipt of the appointed expert's final written report and, "[o]n the basis of the evidence before it, *** determine whether the defendant is fit to stand trial or to plead." *Id.* §§ 104-16(a), (d). If the court determines the defendant is mentally unfit, it may order him placed in the custody of the Department for treatment. *Id.* § 104-17(b). Section 104-17 continues,

> "[i]f during the course of evaluating the defendant for placement, [the Department] determines that the defendant is currently fit to stand trial, it shall immediately notify the court and shall submit a written report within 7 days. In that circumstance the placement shall be held pending a court hearing on the Department's report." *Id.*

¶ 18          Defendant first argues the trial court erred when it found him restored to fitness. "Normally, a trial court's decision that a defendant is fit to stand trial will not be reversed absent an abuse of discretion. [Citation.] However, because this issue is one of constitutional dimension, the record must show an affirmative exercise of judicial discretion regarding the determination of fitness." (Internal quotation marks omitted.) *Shaw*, 2015 IL App (4th) 140106, ¶ 25. "The ultimate decision as to a defendant's fitness must be made by the trial court, not the experts." *People v. Contorno*, 322 Ill. App. 3d 177, 179, 750 N.E.2d 290, 292 (2001). "In other words, the court may not simply rubber stamp an expert's ultimate conclusion that a defendant has been restored to fitness." (Internal quotation marks omitted.) *People v. Gillon*, 2016 IL App (4th) 140801, ¶ 21, 68 N.E.3d 942.

¶ 19          In the present case, defendant does not argue it was improper for the trial court to review the contents of the Department's report in determining his fitness. Rather, he contends it was improper for the court to base its determination "solely on a report from a [licensed clinical social worker] rather than a psychologist or psychiatrist." In support, defendant relies on our opinion in *Gillon* and on his interpretation of the Code.

¶ 20          In *Gillon*, after the State filed a request to revoke the defendant's probation, the defendant's appointed counsel successfully moved the trial court for an evaluation of the defendant's fitness. *Id.* ¶ 6. The court-appointed psychiatrist noted, during his evaluation, the defendant "became increasingly hostile, argumentative, and uncooperative." *Id.* ¶ 7. As a result of the defendant's behavior, the psychiatrist concluded the defendant was unfit to stand trial because he was "unable to cooperate with an attorney and assist in providing a proper defense due to his mental illness." *Id.* The court accepted the psychiatrist's finding and found the defendant unfit to plead or stand trial. *Id.* ¶ 8. Eleven days after the court entered its finding of unfitness, a licensed

clinical social worker employed by the Department conducted a preplacement evaluation with the defendant and found him fit to stand trial. *Id.* ¶ 9. The trial court later conducted a fitness hearing at which the parties stipulated to the Department's report and presented no additional evidence or arguments. *Id.* ¶ 10. The court accepted the report, found the defendant fit to stand trial, and scheduled a hearing on the State's petition to revoke. *Id.* ¶ 10. At the hearing on the State's petition, the court heard testimony and ultimately revoked the defendant's probation. *Id.* ¶ 13. At the end of the proceeding, defendant yelled out: "I didn't do it, Judge. Why don't you believe? I didn't do nothin'. Please, ma'am. I didn't do nothing'. That lady just came here and lied and you all goin' to let her lie." *Id.* The defendant was removed from the courtroom. *Id.* ¶ 14.

¶ 21 On appeal, the defendant argued, *inter alia*, the trial court erred when "it found him restored to fitness in a 'truncated restoration hearing' consisting only of the conclusory opinion of the Department and the parties' stipulation thereto" and "failed to *sua sponte* reopen the issue of his fitness based upon his behavior at subsequent proceedings." *Id.* ¶ 17. We ultimately accepted both of the defendant's arguments. *Id.* ¶¶ 17-18. We began our analysis by citing *People v. Lewis*, 103 Ill. 2d 111, 468 N.E.2d 1222 (1984), for the principle that there is "a difference between the parties stipulating to the fact of fitness and thereby accepting the expert's opinion and conclusion as true and correct [citation], versus stipulating to the content of the opinion testimony that would have been presented by the expert had the expert testified [citation]." (Emphasis omitted.) *Gillon*, 2016 IL App (4th) 140801, ¶ 23. We found that only the latter stipulation was proper because "the ultimate decision rests with the court, not the experts." *Id.* With the latter stipulation, the court could "find the defendant fit, seek more information, or find the evidence insufficient to support a finding of restoration to fitness." *Id.* We then held the trial court had improperly "relied solely on the parties' stipulations in finding [the] defendant had been restored to fitness," noting the court

had "reviewed the Department's report, but there was no discussion as to the bases or opinions contained therein." *Id.* ¶ 25.

¶ 22 After determining the trial court erred in finding the defendant fit based solely on the parties' stipulation to the licensed clinical social worker's fitness conclusion, we continued our analysis and found the court "should have given close consideration to the circumstances of th[e] particular case" because of four factors which "gave rise to pivotal concerns questioning [the] defendant's fitness." *Id.* ¶ 26. The first factor we noted was the "high level of judicial scrutiny" and "careful consideration of the expert's opinion" that is required at a restoration hearing. *Id.* ¶ 27. The second factor was that the Department's evaluation finding the defendant mentally fit was conducted less than two weeks after the trial court found the defendant unfit. *Id.* ¶ 28. We stated this "quick turn of events" required the court to "question[ ] the parties as to how or why defendant had gained fitness in a matter of days." *Id.* Third, we expressed concern that the Department's evaluation and report were completed by a licensed clinical social worker. *Id.* ¶ 29. We acknowledged section 104-17(b) of the Code neither requires the Department's fitness determination be made by a psychiatrist or psychologist, nor prohibits a licensed clinical social worker from making the fitness determination. *Id.* However, we found "in this particular case, the social worker's decision restoring [the] defendant to fitness required the court to perhaps perform a more thorough analysis than otherwise necessary if presented with an opinion from a psychiatrist or psychologist." *Id.* The final factor we referenced was the defendant's outbursts during proceedings that followed the fitness hearing, which we stated "should have put the parties and the court on notice as to whether the Department's opinion was correct" given that it was "more akin to the behavior" observed by the psychiatrist who originally found the defendant unfit than to the behavior described by the Department. *Id.* ¶ 30. We ultimately reversed the trial court's order

revoking the defendant's probation and remanded for a restoration hearing. *Id.* ¶ 33.

¶ 23       We do not believe *Gillon* controls our decision here because that case is clearly limited to its unique facts. As we stated in *Gillon*, our conclusion that the trial court erred in finding the defendant restored to fitness was based on multiple "considerations and the cumulative effect of each upon the other." *Id.* ¶ 31. Indeed, the language from *Gillon* defendant cites in his brief which he claims necessitates a trial court to "perform a more thorough analysis" of a fitness report written by a licensed clinical social worker than that of a psychiatrist or psychologist also states that the heightened degree of scrutiny was only applicable "*in th[at] particular case.*" (Emphasis added.) *Id.* ¶ 29. Although certain of the "considerations" the *Gillon* court reviewed to find the trial court erred are also present in this case, the "cumulative effect" of those factors does not require reversal here because, unlike in *Gillon*, the trial court did not rely on an improper stipulation in finding defendant restored to fitness but instead exercised "a high level of judicial scrutiny" in making its finding.

¶ 24       In determining defendant had been restored to fitness, the trial court in the present case acknowledged and discussed each of the bases and opinions contained in the Department's report relevant to defendant's fitness. The court explicitly noted that in its evaluation, the Department documented defendant's "knowledge and understanding of the charge, the proceedings, what a plea negotiation is, [and] the function of a judge and jury." The court additionally noted defendant was "oriented to time and place and *** [could] assist his attorney during the course of the trial." The court concluded, "based on all of the evidence," defendant was fit for trial. We find this analysis, unlike the court's analysis in *Gillon*, constituted an affirmative exercise of judicial discretion on the part of the court. The court's review of the factual basis contained in the licensed clinical social worker's evaluation rather than merely her ultimate

conclusion as to fitness demonstrates that the court used the report as a tool to reach its own, independent determination of fitness rather than mindlessly deferring to the conclusion of the Department.

¶ 25    We also disagree with defendant's contention that the Code itself requires a trial court conduct a more thorough investigation into defendant's fitness when the Department's report is issued by a licensed clinical social worker instead of a psychiatrist or a psychologist. Defendant asserts section 104-17(b) of the Code "leaves open the question of whether the [l]egislature intended criminal trial courts to solely rely on the opinions of a licensed clinical social worker to determine whether a defendant has been restored to fitness[.]" Defendant continues, because other sections of the Code require the trial court to rely on the opinions of psychologists and psychiatrists, "the Code generally shows a preference for reliance upon the opinions of psychologists or psychiatrists when making mental health-related decisions." Defendant concludes, this court may not interpret section 104-17(b) to "put the opinions of licensed clinical social workers regarding a defendant's fitness to stand trial on the same plateau as the opinions from psychiatrists and psychologist." We disagree.

¶ 26    By requesting that we find a trial court is statutorily obligated to analyze a report issued by a licensed clinical social worker with a higher degree of scrutiny than a report issued by a physician, psychologist, or psychiatrist, defendant is necessarily asking us to add an additional requirement to the statute. As we noted in *Gillon*, section 104-17(b) of the Code does not require the Department utilize a physician, psychologist, or psychiatrist to assess a defendant's fitness during the pretreatment evaluation, nor does it specifically prohibit a licensed clinical social worker from conducting the evaluation. We additionally note that a plain reading of the statute reflects it does not impose an extra degree of scrutiny where the report is issued by a licensed

clinical social worker. Accordingly, we conclude the trial court's task to "ensure[ ] the bases and grounds set forth in the expert's report are justified and satisfactory to the court's determination" (*Gillon*, 2016 IL App (4th) 140801, ¶ 27) remains the same whether the Department's pretreatment evaluation is conducted by a physician, psychiatrist, psychologist, or licensed clinical social worker. As noted above, it appears the trial court in the present case appropriately reviewed the licensed clinical social worker's report and the factual basis upon which she reached her conclusion of fitness in determining defendant was restored to fitness.

¶ 27    Defendant's second argument on appeal is that the trial court erred when it failed to *sua sponte* revisit the issue of defendant's fitness during his resumed sentencing hearing. "Whether a *bona fide* doubt as to a defendant's fitness has arisen is generally a matter within the discretion of the trial court." *Sandham*, 174 Ill. 2d at 382. "A trial court abuses its discretion only where its ruling is arbitrary, fanciful, or unreasonable, or where no reasonable person would take the view adopted by the trial court." (Internal quotation marks omitted.) *People v. Tolefree*, 2011 IL App (1st) 100689, ¶ 53, 960 N.E.2d 27.

¶ 28    The trial court is required to order a fitness hearing, *sua sponte*, anytime a *bona fide* doubt of a defendant's fitness arises. *Sandham*, 174 Ill. 2d at 382. A defendant's fitness to stand trial is a different question from whether a defendant suffers from a mental illness or is mentally unsound. *People v. Gipson*, 2015 IL App (1st) 122451, ¶ 29, 34 N.E.3d 560. As noted above, a defendant will only be found unfit if, "because of his mental or physical condition, he is unable to understand the nature and purpose of the proceedings against him or to assist in his defense." 725 ILCS 5/104-10 (West 2016).

¶ 29    "A number of factors may be considered in assessing whether a *bona fide* doubt of fitness is raised, including a defendant's irrational behavior, demeanor at trial, any prior medical

opinion on the defendant's competence, and any representations by defendant's counsel on the defendant's competence." *People v. Brown*, 236 Ill. 2d 175, 186-87, 923 N.E.2d 748, 755 (2010). However, "there are no fixed or immutable signs which invariably indicate the need for further inquiry to determine fitness to proceed; the question is often a difficult one in which a wide range of manifestations and subtle nuances are implicated." (Internal quotation marks omitted.) *People v. Eddmonds*, 143 Ill. 2d 501, 518, 578 N.E.2d 952, 959 (1991).

¶ 30 Here, defendant claims his "bizarre final address" during his resumed sentencing hearing and his "extensive mental health history" demonstrates "he likely lacked an understanding of the proceedings and could not advance his case for mitigation." Defendant notes the topics he addressed during his statement in allocution ranged from a threat the victim made to "cut [his] balls off" to a "Mexican drug cartel" that "wanted [him] killed" and concluded with defendant claiming he "felt angel wings on [his] back" and speaking a "[l]anguage other than English." Defendant's statement in allocution was certainly irrational at times, and some of the claims he made were similar to the ones he made during his interview with Dr. Killian which caused the doctor to conclude defendant suffered from "delusional thinking and somewhat disjointed thought process." However, we disagree that the statements necessarily raised a *bona fide* doubt of defendant's fitness, even considering defendant's mental health history.

¶ 31 We note again that none of the experts who evaluated defendant's fitness, all of whom were aware of defendant's mental health history, found he did not understand the courtroom participants, courtroom procedure, plea bargaining process, current charges against him, or the possible penalties he faced. Even Dr. Killian, to whom defendant made the same type of irrational remarks included in his statement in allocution, concluded defendant understood the judicial proceedings. Moreover, although the latter portion of defendant's statement in allocution can only

be described as bizarre, his statement began with a lucid and detailed explanation of grievances against the trial court's initial finding of unfitness and against defense counsel and demonstrated defendant's accurate recollection and comprehension both of events that had occurred during earlier proceedings as well as of the law governing those proceedings. For example, defendant noted the trial court had failed in its obligation to admonish him that "he *** ha[d] a right to refuse to cooperate with the examining expert." Defendant even provided accurate citations to the Code, case law, Illinois Supreme Court Rules, and the Illinois Rules of Evidence to support his arguments. We also note that Dr. Froman, who described defendant as "paranoid" and opined defendant "tend[ed] to look at life, society, and others with a great deal of suspicion, derision, and hostility," still determined defendant was fit to stand trial, notwithstanding the presence of these psychological symptoms. Further, it does not appear defense counsel ever raised an issue as to defendant's fitness at the resumed sentencing hearing or expressed any similar concerns to the court.

¶ 32    Accordingly, we cannot say that the trial court abused its discretion in failing to *sua sponte* revisit the issue of defendant's fitness at the resumed sentencing hearing.

¶ 33                          III. CONCLUSION

¶ 34    For the reasons stated, we affirm the trial court's judgment.

¶ 35    Affirmed.